UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
CLARA GARRETT,                      :
                                    :
                    Plaintiff,      :
                                    :     97 Civ. 9148 (BSJ)
         v.                         :
                                    :     **Opinion and Order**
JAMES MAZZA, individually and as    :
Superintendent of Community School  :
District #3, PATRICIA ROMANDETTO,   :
individually and as Superintendent of :
Community School District #3,       :
RUDOLPH CREW, as Chancellor of the  :
New York City Public Schools, and   :
NEW YORK CITY BOARD OF EDUCATION,   :
                                    :
                    Defendants.     :
------------------------------------x

**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

Plaintiff Dr. Clara Garrett ("Garrett") brings this action against Defendants James Mazza ("Mazza"), Patricia Romandetto ("Romandetto"), Rudolph Crew, and the New York City Board of Education ("the Board"), arising out of her removal in July 1997 from her position as principal of a Manhattan public middle school and her subsequent reassignments to different positions in the school system.

## PROCEDURAL HISTORY

Garrett timely filed a complaint contesting her removal from office with the Equal Opportunity Employment Commission. That agency issued a "Notice of Right to Sue" in September 1997, and in December of that year Garrett filed a complaint properly

invoking the jurisdiction of this Court pursuant to 42 U.S.C. § 2000e-5(f)(1) and 28 U.S.C. § 1343(4). That original complaint named Community School Board #3 as a defendant, but did not name the New York City Board of Education.

Garrett alleged violations of: Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; 42 U.S.C. § 1983; 42 U.S.C. § 1985(3); 18 U.S.C. § 241; New York Executive Law 296; and New York City Administrative Code 9-107.

In an Order dated February 13, 2001, this Court granted summary judgment for various defendants on a number of Plaintiff's original claims. The Court denied summary judgment as to Garrett's Title VII discrimination and retaliation claims as to Community School Board #3, and also denied the motion as to the state law discrimination and retaliation claims as to all defendants. A trial on those claims is now pending.

On or about June 28, 2004, Plaintiff filed a Third Amended Complaint, substituting the New York City Board of Education for Community School Board #3 and adding two further claims: that by refusing to appropriately assign her, Romandetto violated 42 U.S.C. § 1983 by restricting Plaintiff's right of access to the courts as protected by the First Amendment to the Constitution; and that she was constructively discharged, also in violation of 42 U.S.C. § 1983.

Before the Court now is a second motion by Defendants for summary judgment on Garrett's claim of constructive discharge. For the reasons set forth below, Defendants' motion for summary judgment is GRANTED.

## FACTS[1]

Garrett was employed by the Board as a principal in Community School District #3 (the "District") from 1979 until July 1997, when then-Deputy Superintendent Mazza removed her from that position. Garrett, who is black, alleges that this removal was, in part, in retaliation for her public criticism of the District's "Choice" plan, and that this and other of the Defendants' subsequent employment actions were in part racially motivated.

In August 1997 Romandetto, who had by then replaced Mazza as District Superintendent, assigned Garrett to the position of Comprehensive Health Coordinator. In that position she worked at the District office, under the Director of Pupil Personnel Services. Her work area was among the secretaries at the District office, at a computer table that had belonged to one of the secretaries, and she was not given a telephone. Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Pl. Memo") at 3.

---

[1] The Court includes record citations only for facts which are in dispute or are mentioned only in Garrett's papers.

In January 1998 Garrett was moved to another office,[2] where "[s]he did the job of a 'clerical aide,' collecting immunization forms from principals and school health surveys," id.

In or about September 1998 Plaintiff was brought up on disciplinary charges, all of which were eventually dismissed. Sometime thereafter, Romandetto assigned Garrett to P.S. 144, where she was told by the principal that her office would be a windowless, unheated supply closet, without a telephone. Id. at 5. When she was removed from that space because of the concerns of the custodial staff over the lack of heat, Garrett was posted to the Board's central headquarters on Livingston Street in Brooklyn. There she was given "a chair next to the coat rack" in a shared office, where she sat "for months and read the *New York Times*" before she was eventually given what were essentially editorial duties reviewing the grammar of decisions of hearing officers before they were presented to the Chancellor for his signature. Id. at 6 (quoting from the transcript of the first day of Garrett's deposition ("Garrett Dep. I"), at 73).

In October or November 1999, Romandetto met with Garrett and offered her five different placement options within District #3, all of which would have allowed her to retain her principal's salary but none of which she found acceptable

---

[2] The record is not clear as to what title or titles Garrett held from January 1998 until November 1999. However, Garrett nowhere alleges that her compensation changed as a result of any of these reassignments.

because none were principalships. Plaintiff's Response to Defendants' Local Rule 56.1 Statement ("Pl. Resp.") at ¶ 21.[3]

In November 1999, Garrett was assigned as principal of the middle school students at Wadleigh Secondary School ("Wadleigh"). She protested this assignment in writing, Pl. Memo at 8 (citing Exhibit 5 to the Affirmation of Michael Sussman ("Sussman Aff'n"), Letter from Garrett to Romandetto dated November 9, 1999). Garrett alleges that she was made to feel unwelcome by the existing administration at Wadleigh, because she had been foisted upon the school as part of what she saw as an inappropriate plan to divide what had been one school into two sub-units within the same building. Pl. Memo at 9-10. Garrett believes that the school and the community blamed her for the disruption caused by this plan, which she neither instituted nor even supported. *Id.*

In March 2000 the community held a public meeting objecting to her placement at Wadleigh. Romandetto then removed Garrett from Wadleigh and assigned her to the position of Director of Pupil Personnel Services, at the same salary, benefits and work schedule of a tenured principal. As one of her duties in this position, Garrett responded to parents' complaints. Garrett

---

[3] In her Response to Defendants' Local Rule 56.1 Statement, Garrett fails to cite to the record in support of her statements controverting Defendants' Statement. Because the Court finds that these statements are in fact thoroughly supported in the record, the Court excuses this technical violation of Local Rule 56.1(d).

-5-

claims that she was given only the complaints of black and Latino parents, and that Romandetto's assistant, who is white, handled the complaints of white parents. Pl. Resp. at ¶ 30; Pl. Memo at 13.

Garrett filed an administrative grievance soon after this appointment, claiming that she had a contractual right to be placed as a principal. The grievance was sustained, by a decision that made clear that Garrett did not have the right to a placement at the school of her choice.[4] Upon resolution of the grievance, Garrett was told she would be assigned as principal of a bilingual middle school, a position for which she felt herself unqualified. She saw this assignment as "programming her to fail," Plaintiff's Counter-Statement of Facts ("Pl. Counter-Stmt"), at ¶ 68 (citing transcript of the second day of Garrett's deposition ("Garrett Dep. II"), at 53). The assignment was upheld by the Chancellor's Office, *id.* at 71 (citing Exhibit 17 to Sussman Aff'n, Grievance Decision (OLR #786), signed by the Chancellor's representative on March 26, 2001 ("The superintendent's assignment of the grievant to the Dual Language Middle School is an appropriate contractual

---

[4] Though Garrett contests this characterization of the decision, *see* Pl. Resp. at ¶ 29, the decision itself is attached as Exhibit 17 to the Sussman Aff'n and reads, in pertinent part, "The grievance is sustained . . . except as to the specific remedy asserted by the grievant, i.e., that she be assigned to [either of two particular schools] in District 3. . . . Nothing in the [Board's rules] gives the grievant a right to pick and choose the particular middle school to which she is to be assigned."

remedy.")). However, Garrett was never told to report to that school. Pl. Counter-Stmt at 72 (citing Garrett Dep. I at 139), and she remained in the position of Director of Pupil Personnel Services.

Throughout the period from July 1997 to August 2002, Garrett "repeatedly advised Romandetto that she wished to be returned to a contractually required principalship," *id.* at 74 (citing Garrett Dep. II at 121-22). She did not, however, seek other employment, hoping instead that this suit would result in an appropriate reassignment. *Id.* at 75 (citing Garrett Dep. I at 123-24). In all her various placements, Garrett retained the pay and benefits that she had received as a principal.

In August 2002, Romandetto assigned a white male coworker to attend an out of town conference to which Garrett had been sent the previous year. Garrett claims that, because of her position within the District, she was the more appropriate choice to attend the conference. The decision to send someone else was the proverbial "last straw" for Garrett, and she retired that same month.

Garrett alleges that the events recited above combined to effect a constructive discharge, in violation of 42 U.S.C. § 1983.

## SUMMARY JUDGMENT STANDARD

On a motion for summary judgment under FED. R. CIV. P. 56(c), the moving party must show that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). In order to defeat a motion for summary judgment, the opposing party must adduce admissible evidence that demonstrates the existence of genuine issues of material fact. *G.D. Searle & Co. v. Medicore Communications, Inc.*, 843 F. Supp. 895, 903 (S.D.N.Y. 1994). In deciding the motion, the district court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, mere conclusory allegations will not suffice to defeat the motion, and there "must be more than a 'scintilla of evidence'." *G.D. Searle*, 843 F. Supp. at 903.

## SUMMARY JUDGMENT ON A CONSTRUCTIVE DISCHARGE CLAIM

"[A] claim of constructive discharge must be dismissed as a matter of law unless the evidence is sufficient to permit a rational trier of fact to infer that the employer deliberately created working conditions that were 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Stetson v. Nynex Serv. Co.*, 995 F.2d 355,

361 (2d Cir. 1993) (quoting *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983)).[5]

Because Garrett claims that Defendants' actions were motivated by racial prejudice, she must show that Defendants made her working conditions intolerable in circumstances from which a rational trier of fact might infer such a discriminatory motive. *See Flaherty v. Metromail Corp.*, 235 F.3d 133, 138 (2d Cir. 2000). Likewise, in order to make out her claim of retaliation, Garrett must present evidence from which the trier of fact might infer a retaliatory motive. *See Sokol v. Reading Regional Airport Authority*, No. Civ.A. 99-111, 1999 WL 562757 (E.D. Pa., July 23, 1999). Then, she must demonstrate "aggravating factors" that make the workplace intolerable. *See, e.g., Jimoh v. Ernst & Young*, 908 F. Supp. 220, 226 (S.D.N.Y. 1995); *Grant v. Morgan Guar. Trust Co.*, 638 F. Supp. 1528, 1538 (S.D.N.Y. 1986). Because the Court finds that Garrett has not presented evidence of "aggravating factors" sufficient that a rational trier of fact could find her work environment intolerable, there is no need specifically to consider whether

---

[5] Garrett argues that *Pennsylvania State Police v. Suders*, ___ U.S. ___, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004), holds that working conditions need not be shown to be "intolerable" to support a constructive discharge claim, and that instead, a showing of a "humiliating demotion" can suffice. This is directly contradicted by the Court's language: "we hold, to establish 'constructive discharge,' the plaintiff … must show that the abusive working environment became so intolerable that her resignation qualified as a fitting response." *Id.* at 2347, 159 L. Ed. 2d at 211.

she has presented competent evidence of discriminatory or retaliatory animus on the part of Defendants.

## INTOLERABLE WORK ENVIRONMENT

What a reasonable person would consider intolerable is "a question of fact that is ordinarily inappropriate for resolution on a motion for summary judgment." *Allen v. Colgate-Palmolive Company*, No. 79 Civ. 1076-CSH, 1985 WL 406, at *2 (S.D.N.Y., March 21, 1985). However, "summary judgment may [sometimes] be appropriate even in the fact-intensive context of discrimination cases," *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001), because the reasonable person standard is objective and "does not depend on such traditionally triable issues as the subjective reaction of any particular employee to changed working conditions." *Halbrook v. Reichhold Chem., Inc.*, 735 F. Supp. 121, 125-26 (S.D.N.Y. 1990).

Courts in this Circuit and others have held that a reasonable person should be able to tolerate a considerable amount of unpleasantness on the job without feeling compelled to resign. *See, e.g., Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir. 1993) (no constructive discharge where plaintiff "was ridiculed by his supervisor, blamed for not knowing about certain changes in company practice of which no one had notified him, harangued by executives, written up and criticized for poor performance, threatened with termination, placed on probation,

and suffered high blood pressure as a result of his supervisor's treatment."); *Katz v. Beth Israel Med. Ctr.*, No. 95 Civ. 7183 AGS, 2001 WL 11064, at *14 (S.D.N.Y. Jan. 4, 2001) (no constructive discharge where employee was "routinely" berated by her supervisors, criticized unfairly, given insufficient staff assistance, told to resign if dissatisfied, "and at least once threatened with termination"); *Mark v. Mt. Sinai Hospital*, 85 F. Supp. 2d 252, 257 (S.D.N.Y. 2000) (no constructive discharge where psychologist employed by hospital was deprived of a personal office and had to wheel a portable filing cabinet with her patient records from office to office every day, absent evidence that she was unable to secure a private room to meet with patients or that portable filing cabinet compromised security of confidential patient records).[6]

Here, Garrett has failed to offer evidence that, even when viewed in the light most favorable to her, makes the required showing of intolerability. Although Garrett may have been displeased with her position within the District and even

---

[6] *But see* this Court's decision in *Smitherman v. Williams-Sonoma*, No. 96 Civ. 5772(BSJ), 1999 WL 608781, at *6 (S.D.N.Y. August 11, 1999). There, plaintiff alleged she was subjected to frequent comments denigrating her race and religion; repeatedly warned never to call corporate headquarters again after doing so once to complain about her treatment; passed over for promotions for which she was qualified; and that defendants caused her brother (and fellow employee) to be arrested and detained for a prolonged period as part of a scheme to force her to resign. In denying summary judgment, I found in *Smitherman* that the plaintiff had presented ample evidence that, if believed, could have led a rational trier of fact to conclude that her work environment had been made intolerable by an employer motivated by racial and retaliatory animus.

humiliated by the circumstances of her reassignments, as she claims, no rational trier of fact could find that the evidence presented could add up to working conditions that a reasonable person would find "intolerable."

Three undisputed facts in particular demonstrate this. First, Romandetto offered Garrett the choice of five different placements that would have allowed her to leave the position of Comprehensive Health Coordinator, to which she had been assigned after she was removed from her principalship. Garrett refused to accept any of the offered positions as not commensurate with her skills and experience, even though her salary and benefits would have remained the same had she taken any of them. The Court of Appeals for the Second Circuit has held that a constructive discharge cannot be established through evidence that the employee was simply "dissatisfied with the nature of [her] assignments," *Stetson*, 995 F.2d at 360; *see also Gray v. York Newspapers, Inc.*, 957 F.2d 1070 (3d Cir. 1992) (employee's subjective interpretation that continued employment would be uncomfortable and demeaning and would lead to demotion or termination in the future does not constitute constructive discharge); *Gumbs v. Hall*, 51 F. Supp. 2d 275 (W.D.N.Y. 1999) (no constructive discharge where plaintiff was simply "less than satisfied with the alternatives offered to her, because of her

subjective belief that they would be a step down from her prior position").

Second, Garrett remained in her position as Director of Pupil Personnel Services for more than two years despite her purported discontent, undermining her claim that she found the conditions "intolerable." The Court acknowledges that "the effect of a number of adverse conditions in the workplace is cumulative," *Chertkova v. Connecticut General Life Ins. Co.*, 92 F.3d 81, 90 (2d Cir. 1996), and that workplace conditions in some instances become intolerable only after such a process of accumulation. Nevertheless, most courts have disfavored constructive discharge claims where plaintiffs have remained on the job for more than a brief time. *See, e.g., Flaherty v. Metromail Corp.*, No. 98 CIV. 8611 (NLRB), 2001 WL 868011, at *5 (S.D.N.Y. July 31, 2001) (granting summary judgment for defendant where plaintiff's five-month "voluntary service following her alleged 'constructive discharge'" weighed heavily against her); *Rodriguez v. Graham-Windham Servs. to Families and Children*, No. 99 Civ. 10447 AGS, 2001 WL 46985, at *6 (S.D.N.Y. January 18, 2001) (where plaintiff agreed to work for two weeks beyond the date stated in her letter of resignation, court found "it would be difficult for a reasonable person to accept that an employee would voluntarily agree to work for a longer time in an atmosphere so intolerable that she felt forced to resign.").

Here, Garrett's continued service belies her contention that her work environment was intolerable.

Finally, Garrett has presented no evidence that her compensation was ever affected. Courts have found evidence of changes in compensation to be significant support for a claim of constructive discharge; *see, Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 161 (2d Cir. 1998) (evidence supported jury verdict of constructive discharge where plaintiff's compensation had been reduced by more than half, resulting in "a condition so difficult that a reasonable person in [his] shoes would have felt compelled to resign"). Conversely, courts have found the absence of such evidence fatal to plaintiffs' claims, *see, Tanay v. St. Barnabas Hospital*, No. 99 Civ. 9215 (JGK), 2001 WL 262695 (S.D.N.Y., March 15, 2001) (no constructive discharge where plaintiff, though reassigned to her perceived detriment in retaliation for her complaints of discrimination, retained same salary, benefits and work hours). The fact that Garrett's salary and benefits were never reduced during the five years under consideration weighs very heavily against her claim of constructive discharge.

## CONCLUSION

Construing the evidence in Garrett's favor, the Court finds that she has failed to show that her working conditions were so intolerable as to constitute a constructive discharge. Because

Garrett did not establish this essential element of her claim, the Court need not address the sufficiency of her evidence on Defendants' retaliatory or racial motives.

Defendants' motion for summary judgment is granted on the claim of constructive discharge. The parties are directed to submit a joint pre-trial order on or before September 30, 2005. Trial shall commence on November 14, 2005 at 10:00 a.m. All motions in limine, proposed voir dire questions, and proposed jury instructions shall be submitted to the Court on or before November 7, 2005.

**SO ORDERED:**

_____
Barbara S. Jones
UNITED STATES DISTRICT JUDGE

New York, New York
August 30, 2005