```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  2/22/10
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------x
                                      :
CLARA GARRETT,                        :
                                      :
                    Plaintiff,        :
                                      :     97 Civ. 9148 (BSJ)
          v.                          :     **Order and Opinion**
                                      :
JAMES MAZZA, individually and as      :
Superintendent of Community School    :
District #3, PATRICIA ROMANDETTO,     :
individually and as Superintendent of :
Community School District #3,         :
RUDOLPH CREW, as Chancellor of the    :
New York City Public Schools, and the :
NEW YORK CITY BOARD OF EDUCATION,     :
                                      :
                    Defendants.       :
--------------------------------------x

**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

Plaintiff Clara Garrett ("Plaintiff") commenced this action

on December 11, 1997 against Defendants James Mazza ("Defendant

Mazza") and Patricia Romandetto ("Defendant Romandetto," and

together with Mazza, "Defendants") based on her removal in July

1997 from a position as principal of a Manhattan public middle

school ("M.S. 118") and her subsequent reassignments to

different positions in the school system.[1]  Pending before the

Court is Defendants' Motion for judgment as a matter of law

pursuant to Federal Rule of Civil Procedure 50.  After careful

---

[1]     Claims against Rudolph Crew were dismissed in their entirety on
December 18, 2006.  (Trial Tr. Dec. 18, 2006 961-62.)  Claims against
the New York City Board of Education were dismissed by Order dated
December 8, 2006.

consideration of the parties' submissions and a full review of
the record, Defendants' Motion is GRANTED.

## BACKGROUND[2]

### Facts

Plaintiff began working as a principal at M.S. 118 in
Community School District #3 (the "District") in 1979.  (See,
e.g., Pl. Trial Ex. 2.)  By 1982, Plaintiff had advanced from
acting principal of M.S. 118 to probationary principal to,
finally, a position as a tenured principal of the school.  (See,
e.g., Pl. Trial Exs. 3, 4, 6.)  From 1979 through 1995,
Plaintiff received "Satisfactory" ratings on her annual
Pedagogical Supervisory Personnel Reports.  (See, e.g., Pl.
Trial Exs. 3-13, 15, 70.)

In July 1994, Plaintiff's annual Pedagogical Supervisory
Personnel Report (the "1994 Report") indicated that 15.8% of
students at M.S. 118 were reading at or above grade level, and
24.5% were at or above grade level in mathematics.  (Pl. Trial
Ex. 70.)  In the same year, student attendance at M.S. 118 ran
below the middle school average, and hit a low of 78% in
January.  (Id.)  The 1994 Report further stated that
"standardized test scores and pupil attendance are powerful
indicators of a school's effectiveness and the signs at M.S. 118

---

[2]     The facts of this case are drawn from undisputed trial testimony and
prior Orders of this Court.  See generally Garrett v. Mazza, et al., 97
Civ. 9148, 2005 WL 2094955 (S.D.N.Y. Aug. 30, 2005).  General
familiarity with the facts, parties, and legal issues is assumed.

are not positive at present." (Id.) Nonetheless, Defendant

Mazza—at that time the District Superintendent—rated Plaintiff's

performance as "Satisfactory" for the 1993-94 school year. (See

id.)

In 1994-95, M.S. 118 was extremely undersubscribed, with

only 35 incoming sixth-grade students requesting M.S. 118 as

their first choice of middle schools. (See Pl. Trial Ex. 109;

see also Pl. Ex. 120 (indicating an active register of 332, as

compared to a projected enrollment of 410 students).) The 1995

test results indicated that 20% of M.S. 118 students performed

at or above grade level in reading and 21% of students in

mathematics. (Pl. Trial Ex. 93.)

Around the same time, Defendant Mazza received an anonymous

letter from "A Frightened Staff" complaining that "M.S. 118 has

become a nightmare." (Defs.' Trial Ex. G.) The letter further

stated that "intruders are entering the building daily; teachers

are ignored, jostled, and cursed at" and "glass windows in doors

and stair partitions are being broken daily." (Id.) In June

1995, physically disabled students at M.S. 118 staged a protest,

claiming, among other things, that they were unable to enter the

playground or the computer room and that Plaintiff had not paid

attention to previous such complaints. (See Defs.' Trial Ex.

J.) Also in June 1995, Helen Santiago—a Deputy Superintendent

assigned to M.S. 118 to assist Plaintiff—wrote to Defendant

Mazza to report a series of incidents in which students swore at her and teachers condoned cutting class. (See Defs.' Trial Exs. H, N.)

In September 1995, Defendant Mazza rated Plaintiff "Unsatisfactory" in her annual Pedagogical Supervisory Personnel Report (the "1995 Report"). (See Pl. Trial Ex. 84.) The 1995 Report indicated that this decision had been reached based on multiple criteria, including "[i]nsufficient school progress and performance in mathematics," "[d]rop in pupil performance as measured by standardized tests," and "[u]nimproved school tone and climate reflected in student misbehavior and misconduct." (Id.)

In 1995-96, M.S. 118 received the second-highest per student funding in the District. (Defs.' Trial Ex. R.) Nonetheless, for the 1995-96 school year, 12.6% of students at M.S. 118 were reading at or above grade level, compared with 39.1% of students at all city schools and 36.4% of students at schools comparable to M.S. 118. (See Pl. Trial Ex. 121.) Also in the 1995-96 school year, 26.9% of students at M.S. 118 performed at or above grade level in mathematics, compared with 53.8% of students citywide and 52.0% of students at comparable schools. (Id.) In November 1995, Defendant Mazza wrote to Plaintiff expressing his concern over a letter he allegedly received from the United Federation of Teachers District

4

Representative complaining that "seventh grade students [were] 'running amuck' throughout the building 'disturbing 6th and 8th grade teaching-learning." (Defs.' Trial Ex. P.)

Plaintiff was injured in the spring of 1996 and missed the remainder of the school year due to post-traumatic headache and backache syndrome. (See Pl. Trial Exs. 134, 137.) At the end of the 1995-96 school year, Defendant Mazza gave Plaintiff a "Satisfactory" rating on her 1996 Pedagogical Supervisory Personnel Report. (See Trial Tr. Dec. 14, 2006 683, 730-31.) Defendant Mazza testified at trial that this rating was not based on Plaintiff's performance as principal of M.S. 118, but that he felt obliged to give Plaintiff a "Satisfactory" rating because he "could not complete the year evaluation knowing full well that a person had not been in the school building for three months." (Id. 730.)

In 1996-97, M.S. 118 still received the second-highest amount of per-student funding in the District. (Defs.' Trial Ex. R.) Nonetheless, by September 1996, reading scores on the California Testing Bureau tests at M.S. 118 had fallen from fourteenth among District middle schools to fifteenth and last. (See Pl. Trial Exs. 147; see also Pl. Trial Ex. 121.)

In February 1997, Edna Johnson ("Johnson"), principal of a school that shared the same building with M.S. 118, wrote to Plaintiff and Defendants complaining that "the incidents

involving M.S. 118 students running wild through the hallways and fighting in the stairways continue to escalate." (Pl. Trial Ex. 170.) Johnson stated that "teachers continue to feel unsafe escorting their class down the stairs for fear of [their] students being hit, cursed at, or just run-over." (Id.) Johnson further stated that she "wish[]ed [Garrett] would attend to these safety issues."

In June 1997, a letter signed by "Concerned Teachers M.S. 118" was sent to Defendants alleging that "[o]ur school, MS 118 is out of control and we need help." (See Pl. Trial Ex. 291; Defs.' Trial Ex. CC.) The authors of the letter detailed several complaints, including that "students use bad language and are generally disrespectful" and "run around the cafeteria, and "there are no consequences for the above or for unruly and disruptive behavior in general." (Id.) The letter further indicates that "the common denominator in this failed school is the principal," and requesting "help [to] put an end to this reign of terror." (Id.)

In Summer 1997, Defendant Mazza rated Plaintiff "Unsatisfactory" on her Pedagogical Supervisory Personnel Report for the year (the "1997 Report"). (See Pl. Trial Ex. 204.) The 1997 Report stated that this rating was due to various factors, including "[p]ersistent failure to exercise the leadership necessary to attract students to M.S.A. 118 and build a

6

successful learning community" and "[p]oor record of student
performance and behavior."   (Id.)

        In July 1997, Defendant Mazza removed Plaintiff from her
position as principal of M.S. 118.   In August 1997, Defendant
Romandetto, who had by then replaced Defendant Mazza as District
Superintendent, assigned Plaintiff to the position of
Comprehensive Health Coordinator.   (See Order Aug. 30, 2005 3.)
In that position, Plaintiff's work area was among the
secretaries at the District office, at a computer table that had
belonged to one of the secretaries, and she was not given a
telephone.   (See id.)   In January 1998, Plaintiff was moved to
another office, where she "worked menial jobs befitting a
clerk."   (Pl. Opp. 9.)

        In or about September 1998, Defendant Romandetto brought
administrative disciplinary charges against Plaintiff on claims
including "[i]nsubordination," "[n]eglect of duty,"
"[i]ncompetant and inefficient service."   (Pl. Trial Ex. 225.)
Sometime thereafter, Defendant Romandetto assigned Plaintiff to
P.S. 144, where Plaintiff was told by the principal that her
office would be a windowless, unheated supply closet without a
telephone.   (See Order Aug. 30, 2005 4.)   When she was removed
from that space due to concern over the lack of heat, Plaintiff
was posted to the New York City Board of Education's (the
"Board") central headquarters to review the decisions of hearing

                                    7

officers before they were presented to the Chancellor for his signature. (Id.)

All disciplinary charges against Plaintiff were dismissed in October 1999. (See Pl. Opp. 9.) In October or November 1999, Defendant Romandetto met with Plaintiff and offered Plaintiff five different placement options within the District, all of which would have allowed her to retain her principal's salary but none of which Plaintiff found acceptable because none were principalships. (See Order Aug. 30, 2005 4-5; Pl. Opp. 10.)

In November 1999, Plaintiff was assigned as principal of middle school students at Wadleigh Secondary School ("Wadleigh"). (Pl. Trial Ex. 253.) Plaintiff protested this assignment in writing. (See Pl. Trial Ex. 257.) Plaintiff stated that she was made to feel unwelcome at Wadleigh, because she had been foisted upon the school as part of what Plaintiff saw as an inappropriate plan to divide what had been one combined secondary school into two sub-units—middle and high school—in one building. (See id.)

In March 2000, the Wadleigh community held a public meeting protesting Plaintiff's placement at the school. (See Order Aug. 30, 2005 5.) Defendant Romandetto then removed Plaintiff from Wadleigh and assigned her to the position of Director of Pupil Personnel Services, a position carrying the same salary,

8

benefits, and work schedule as that of a tenured principal.

(See id.)

Plaintiff filed an administrative grievance soon after her

appointment as Director of Pupil Personnel Services, claiming

that she had a contractual right to be placed as a principal.

(See Order Aug. 30, 2005.) Plaintiff's grievance was sustained;

however, the decision made clear that Plaintiff did not have a

right to placement at the school of her choice. (See Pl. Trial

Ex. 275.) Upon resolution of the grievance, Plaintiff was told

she would be assigned as principal of the Dual Language School,

a Spanish-English bilingual middle school. Plaintiff protested

this assignment, stating that her inability to speak Spanish

made her unqualified for such a position. (See id.; see also

Pl. Trial Ex. 279; Pl. Opp. 10.) The assignment was upheld by

the Chancellor's Office, which again indicated that "[n]othing

in the Excessing Rules gives the grievant a right to pick and

choose the particular middle school to which she is to be

assigned." (Pl. Trial Ex. 279(a).)

Following Plaintiff's rejection of an assignment to the

Dual Language School, Plaintiff remained in her position as

Director of Pupil Personnel Services. (See, e.g., Pl. Trial Ex.

282.) Plaintiff repeatedly requested that Defendant Romandetto

assign her to a "position commensurate with [her] license and

experience." (Pl. Trial Ex. 282.) However, throughout

9

Plaintiff's various placements, she retained the same pay and
benefits that she had received as a principal. (See Order Aug.
30, 2005 7.) On August 19, 2002, Plaintiff retired from the
Board. (See Pl. Trial Ex. 284.)

## Procedural History

On December 11, 1997, Plaintiff commenced this action in
the Southern District of New York. On or about June 28, 2004,
Plaintiff filed a Third Amended Complaint alleging, among other
things, that Defendants had discriminated against her because of
her race in violation of New York State Human Rights Law, N.Y.
Exec. Law § 290 et seq. and New York City Administrative Code §
9-107 (together, "NYHRL") and retaliated against her in
violation of the First Amendment to the United States
Constitution and NYHRL.

On December 11, 2006, the jury trial of this action
commenced before the Court. At the conclusion of Plaintiff's
case-in-chief, Defendants moved to dismiss Plaintiff's claims in
their entirety pursuant to Rule 50 of the Federal Rules of Civil
Procedure. On December 17, 2006, the Court granted this motion
in part.

Remaining claims were submitted to the jury. Thus, the
jury was presented with claims of: (1) race discrimination in
violation of NYHRL against both Defendants Mazza and Romandetto;
(2) First Amendment retaliation claims against Defendant Mazza;

10

and (3) NYHRL retaliation claims against Defendant Romandetto.
On December 21, 2006, the jury returned a partial verdict,
finding in favor of Defendants on both retaliation claims.
However, the jury was unable to reach a unanimous decision with
respect to Plaintiff's NYHRL race discrimination claims.

On January 19, 2007, Defendants filed a renewed Motion for
judgment as a matter of law on Plaintiff's race discrimination
claims pursuant to Federal Rule of Civil Procedure 50(b).
Plaintiff filed her opposition motion on February 1, 2007. On
February 21, 2007, Defendants filed a reply memorandum in
further support of their Motion.

## LEGAL STANDARD

Pursuant to Rule 50 of the Federal Rules of Civil
Procedure, "[i]f a party has been fully heard on an issue during
a jury trial and the court finds that a reasonable jury would
not have a legally sufficient evidentiary basis to find for the
party on that issue, the court may (A) resolve the issue against
the party; and (B) grant a motion for judgment as a matter of
law against the party on a claim or defense that, under the
controlling law, can be maintained or defeated only with a
favorable finding on that issue." Fed. R. Civ. P. 50(a). Rule
50(b) further provides that "[i]f the court does not grant a
motion for judgment as a matter of law made under Rule 50(a),
the court is considered to have submitted the action to the jury

11

subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment—or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged— the movant may file a renewed motion for judgment as a matter of law." Fed. R. Civ. P. 50(b); see also O'Brien v. Thall, 283 F.2d 741 (2d Cir. 1960) (finding that the district court may decide a renewed motion for judgment as a matter of law after jury is unable to reach a verdict).

A district court may grant a Rule 50 motion for judgment as a matter of law "only when, viewing the evidence most favorably to the party other than the movant, there can be but one conclusion as to the verdict that reasonable [jurors] could have reached." Weldy v. Piedmont Airlines, Inc., 985 F.2d 57, 59-60 (2d Cir. 1993) (internal quotations omitted). The Court must "defer[] to the jury's assessment of the evidence and all reasonable inferences the jurors could draw from that evidence," and "may not itself weigh the credibility of witnesses or consider the weight of the evidence." Meloff v. New York Life Ins. Co., 240 F.3d 138, 145 (2d Cir. 2001) (internal quotation omitted). Therefore, a court should "review all of the evidence in the record," and "should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to

the extent that that evidence comes from disinterested witnesses." Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 150-51 (2000) (citation and internal quotation marks omitted).

## DISCUSSION

"[C]laims of discrimination under the Human Rights Laws of New York City and New York State are evaluated using the same analytic framework used in Title VII actions." Farias v. Instructional Sys., Inc., 259 F.3d 91, 98 (2d Cir. 2001). Accordingly, the burden-shifting analysis established by the Supreme Court in McDonnell Douglas Corp. v. Green applies in the instant case. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Ferraro v. Kellwood Co., 440 F.3d 96, 99 (2d Cir. 2006) ("In discrimination claims brought under the New York State and New York City Human Rights Laws, the burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green applies.").

Under McDonnell Douglas, a plaintiff has the initial burden of making out a prima facie case of discrimination. See 411 U.S. at 802. Once the plaintiff makes this showing, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the employee's dismissal. See Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). If such a reason is proffered, the burden shifts back to the

plaintiff to prove that discrimination was the real reason for the employment action. See id. at 253.

To meet the initial burden of production required for a prima facie case of race discrimination, a plaintiff must show: "(1) that he belonged to a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." Holcomb v. Iona College, 521 F.3d 130, 138 (2d Cir. 2008). The Second Circuit has repeatedly stressed that "the burden of establishing this prima facie case in employment discrimination cases is minimal." McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir. 2001) (internal quotation omitted). Nonetheless, it is still incumbent on the plaintiff to come forward with sufficient admissible evidence to continue with the case. See Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 65 (2d Cir. 1997).

In the instant case, Plaintiff seeks to support an inference of discriminatory intent sufficient to establish a prima facie case of race discrimination under a "disparate treatment" theory. (See, e.g., Trial Tr. Dec. 15, 2007 177 (stating that Plaintiff's race discrimination claims are based on a theory of disparate treatment);) see also Int'l Brotherhood

14

of Teamsters v. United States, 431 U.S. 324, 335 n. 15 (1977)

(detailing different theories of race discrimination).

Under the "disparate treatment" theory, a plaintiff must

show that "similarly situated employees of a different race were

treated more favorably." Norville v. Staten Island Univ. Hosp.,

196 F.3d 89, 95 (2d Cir. 1999). "In order to make such a

showing, the plaintiff must compare herself to employees who are

similarly situated in all material respects." Id. (internal

quotation omitted). As the Second Circuit has noted, "what

constitutes 'all material respects' . . . varies somewhat from

case to case and . . . must be judged based on (1) whether the

plaintiff and those he maintains were similarly situated were

subject to the same workplace standards and (2) whether the

conduct for which the employer imposed discipline was of

comparable seriousness." Graham v. Long Island R.R., 230 F.3d

34, 40 (2d Cir. 2000). Ultimately, "the standard for comparing

conduct requires a reasonably close resemblance of the facts and

circumstances of plaintiff's and comparator's cases, rather than

a showing that both cases are identical." Id.; see also

McGuinness v. Lincoln Hall, 263 F.3d 49, 54 (2d Cir. 2001)

("[W]here a plaintiff seeks to establish the minimal prima facie

case by making reference to the disparate treatment of other

employees, those employees must have a situation sufficiently

similar to plaintiff's to support at least a minimal inference

15

that the difference of treatment may be attributable to discrimination.").

"Whether two employees are similarly situated ordinarily presents a question of fact for the jury." Graham, 230 F.3d at 39 (citations omitted). However, "[t]his rule is not absolute . . . and a court can properly grant [judgment as a matter of law] where it is clear that no reasonable jury could find the similarly situated prong met." Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 n.2 (2d Cir. 2001); see also Piesco v. Koch, 12 F.3d 332, 341 (2d Cir. 1993) (finding that post-trial motions for judgment as a matter of law must be evaluated under the same standard as that used to review summary judgment motions brought under Federal Rule of Civil Procedure 56).

In the instant case, the parties appear to agree that Plaintiff can establish the first three elements of her prima facie case, disputing only whether Plaintiff's removal from office took place under circumstances giving rise to an inference of discrimination. Defendants contend that Plaintiff has failed to identify any similarly situated white comparators who were treated more favorably, and thus that no reasonable jury could find that Plaintiff was removed from office under such circumstances. The Court agrees.

I.    Plaintiff Has Not Established a Prima Facie Case of Race

Discrimination Against Defendant Mazza

In moving for judgment as a matter of law, Defendants argue

that Plaintiff has failed to make out a prima facie case that

Defendant Mazza removed her from her position as principal of

M.S. 118 because of her race.  Specifically, Defendants argue

that Plaintiff has failed to identify any non-minority principal

whose conduct was comparable to Plaintiff's and whom Defendant

Mazza treated more favorably than he did Plaintiff, and thus

that Plaintiff has provided no evidence from which to infer that

Defendant Mazza's treatment of Plaintiff was attributable to

racism.  See, e.g., McGuinness, 263 F.3d at 54.

Plaintiff has opposed Defendants' Motion, stating that

Defendant Mazza "treated [Plaintiff] disparately because [he]

allowed white principals to remain for years in failing schools,

as defined by the Chancellor and the State, while [he] moved

[Plaintiff], an African-American, from her school."  (Pl. Opp.

12.)  Specifically, Plaintiff claims that Defendant Mazza gave

Plaintiff "Unsatisfactory" ratings on her 1994-95 and 1996-97

annual reviews and removed her from office while a white middle

school principal otherwise similarly situated, Jules Linden

("Linden"), received satisfactory ratings and was permitted to

remain in office. (See Pl. Opp. 7; Pl. Letter Dec. 17, 2006.[3])
To support her use of Linden as a comparator, Plaintiff notes
that Linden's school, M.S. 54, was listed on the New York State-
maintained list of Schools Under Registration Review ("SURR")—a
means of identifying poorly performing schools—from 1991 to
1996.[4] (See Pl Letter Dec. 17, 2006; Pl. Trial Ex. 167, Pl. Opp.
7-8.) Plaintiff further notes that even though M.S. 118 was
supposedly failing, and presumably to a worse extent than M.S.
54, her school was never listed on the SURR list. (Pl. Opp. 7-
8.) Yet, Plaintiff was removed from office and Linden was not.

Plaintiff does not dispute, however, that Linden's students
at M.S. 54 performed at a far higher level than Plaintiff's.
The evidence at trial demonstrated that Plaintiff's school, M.S.
118, was ranked fifteenth and last among District middle schools
in 1996. (See Pl. Ex. 147; Trial Tr. Dec. 12, 2006 306; Trial
Tr. Dec. 15, 2006 90-91.) By comparison, Linden's school was
ranked in the top four schools in the District. (See Trial Tr.

---

[3]     On December 17, 2006, in response to Defendants' initial motion for
judgment as a matter of law, this Court Ordered Plaintiff to provide
briefing as to who her comparators were and how these comparators were
similarly situated to Plaintiff. (See Order Dec. 17, 2006; see also
Trial Tr. Dec. 15, 2006 175-79 (discussing evidence in record on
comparators and need for additional briefing).) Plaintiff's Letter of
December 17, 2006 was submitted in response to that Order, and as such
lays out her argument on the issue.

[4]     The precise methodology used by New York State to designate a SURR
school was not made clear during the trial. However, Defendant Mazza
testified that the designation indicated that a school had "[f]ailed to
meet the standards that [the State] set." (Trial Tr. Dec. 14, 2006
572.) Plaintiff's school was on the preliminary list of schools slated
for SURR identification, but was never so listed. (See Pl. Trial Ex.
147.)

Dec. 15, 2006 90-91.)  Likewise, students at M.S. 54 scored
between 30% and 50% higher in reading than Plaintiff's students
at M.S. 118.  (See Trial Tr. Dec. 14. 2006 752-53.)

Plaintiff also does not dispute that Linden's school
received significantly more applications from parents of
prospective students than Plaintiff's school.  (Trial Tr. Dec.
14, 2006 728-30.)  Linden's school was "oversubscribed," meaning
there were more student applications for the school than spots
available.  (Id.)  M.S. 118, by comparison, was
"undersubscribed," indicating that the school received fewer
applications than spots available.  (Id.; Pl. Trial Ex. 109.)

It is also undisputed that, between 1995 and 1997,
Plaintiff's school received the second-highest amount of funding
per student in the district.  (Defs.' Trial Ex. R.)  By
comparison, students at M.S. 54 received a per-student
expenditure lower than the district average between 1995 and
1997.  (Id.)

The evidence at trial indicated that Defendant Mazza
received letters attributed to District staff, employees at M.S.
118, and anonymous individuals complaining about disciplinary
problems at M.S. 118, student insubordination, and other issues
relating to Plaintiff's leadership at the school.  (Defs.' Trial
Exs. E, G, H, X, CC, SS; Trial Tr. Dec. 14, 2006 724.)
Defendant Mazza testified that he did not receive these types of

reports or complaints regarding any other principals in the
District, and Plaintiff has not disputed this evidence. (Id.)

The Second Circuit has made clear that, to raise an
inference of discrimination based on a disparate treatment
theory, a plaintiff must "show that similarly situated employees
who went undisciplined engaged in comparable conduct." Graham,
230 F.3d at 40. In this case, Plaintiff has relied almost
entirely on M.S. 54's identification on the SURR list to argue
that Linden engaged in comparable conduct to Plaintiff—i.e.,
that if Plaintiff's school was failing, so was Linden's—but that
Linden, unlike Plaintiff, was not disciplined for his conduct.
(See, e.g., Pl. Letter Dec. 17, 2006 ("[T]he clearest comparator
is [Jules] Linden, who was a long-time principal of another
middle school, whose school was on the SURR list for at least
six years of his principalship and who was never given [an
Unsatisfactory] rating or brought up on any charges. [T]his
white man had the same position as [Plaintiff] (middle school
principal), was subject to the same standards as [Plaintiff]
(those set forth by [Defendant] Mazza, i.e., the achievement of
the students in his school . . .) and was subject to the same
chain of command ([Defendants Mazza and Romandetto]), under both
of which [Superintendencies] [Linden's] school was in the SURR
category while [Plaintiff's] was never in that category.").)

20

Greater leniency in disciplinary matters to members of one race over another may state a claim for relief under Title VII. See, e.g., Woodbury v. New York City Transit Auth., 832 F.2d 764 (2d Cir. 1987). However, to establish pretext based on a "selective enforcement" theory, a plaintiff employee must show that his or her conduct was comparable to that of other "similarly situated" employees. See Norville, 196 F.3d at 95. Taken alone, the fact that Linden's school was listed on the SURR list cannot establish that Plaintiff and Linden were similarly situated and warranted equal levels of disciplinary action.[5] On the contrary, the evidence at trial established that Linden was not at all comparable to Plaintiff. Linden's students were performing better than Plaintiff's, his school did not suffer from the behavior problems that plagued M.S. 118, and parents viewed his school in a better light.

Plaintiff has argued that the reasons put forth by Defendant Mazza in the 1995 Report as bases for her "Unsatisfactory" rating were "fundamentally untrue and that [Defendant] Mazza had not discussed them with her during the preceding school year." (Pl. Opp. 3.) Even accepting that Defendant Mazza harbored personal animus against Plaintiff and that he made up some or all of the allegations used to justify

---

[5]     In fact, M.S. 54 left the SURR list after 1996, indicating that the school had improved under Linden's tutelage. (See Pl. Trial Ex. 167.) Meanwhile, Plaintiff's school slipped ever lower in the ranks, from fourteenth to fifteenth in the district. (See Pl. Trial Ex. 147.)

her dismissal, though, Plaintiff has failed to put forth any evidence allowing a jury to conclude that this animus was based on racial discrimination or that it led to a racially discriminatory employment decision. Namely, Plaintiff has not introduced any evidence that a similarly-situated comparator—i.e., a white middle school principal who received high amounts of per-student funding but whose school was nonetheless undersubscribed, toward the bottom of District rankings in academic achievement, and subject to chronic disciplinary issues—was treated differently than Plaintiff. In the absence of such evidence, Plaintiff cannot make out a prima facie case of race discrimination, and a reasonable jury could not find in her favor on this claim.

Because Plaintiff has failed to show that her removal from office took place under circumstances giving rise to an inference of discriminatory intent, her race discrimination claim against Defendant Mazza must be DISMISSED.

## II.  Plaintiff Has Not Established a Prima Face Case of Race

### Discrimination Against Defendant Romandetto

In moving for judgment as a matter of law on the race discrimination claim against Defendant Romandetto, Defendants again argue that Plaintiff has failed to identify any similarly situated white principals who Defendant Romandetto treated more favorably than Plaintiff. Specifically, Defendants argue that

22

Plaintiff cannot make out a prima facie race discrimination case against Defendant Romandetto because "Plaintiff has failed to point to a single white principal who had charges initiated against him or her, the charges were later dismissed and then the individual received his or her choice of school placement." (Defs.' Mot. 7.)

Plaintiff opposes Defendants' Motion, contending that Defendant Romandetto treated Plaintiff disparately because, following the dismissal of all administrative charges against Plaintiff in October 1999, Defendant Romandetto placed and/or maintained similarly situated and less-senior white employees in principalships while failing to reassign Plaintiff to a principal position. (See Pl. Opp. 9, 11, 13; Pl. Letter Dec. 17, 2006.) Specifically, Plaintiff claims that Defendant Romandetto "denied [Plaintiff] any assignment in her job title," while "whites whose schools were worse performing were rewarded (Cheryl Rosen [("Rosen")]) with new assignments." (Pl. Opp. 12-13.) Plaintiff argues that she is similarly situated to Rosen, "a white female who was appointed [after Plaintiff's removal from office] as principal of a middle school . . . though her school had previously been rated a SURR school." (Pl. Letter Dec. 17, 2006.) Plaintiff has also mentioned as possible comparators "Lawrence Lynch [("Lynch")], a white male who was . . . appointed as a principal though he had never so served

previously and Steven Buchsbaum [("Buchsbaum")], who was [also] appointed and maintained (while on his probationary period) at another [middle] school in the district while [Plaintiff] was disallowed from resuming a principalship." (Id.)

However, none of these alleged comparators were appointed to a principalship following the dismissal of administrative charges against Plaintiff in October 1999—a minimum requirement for a jury to infer that Defendant Romandetto's failure to assign Plaintiff to a position after that date was attributable to her racist discrimination between a comparator and Plaintiff. Rosen was principal of the Horizons school from at least 1997, after which her school merged into the School for Academic and Athletic Excellence. (See Trial Tr. Dec. 15, 2006 19-22.) Lynch was selected to replace the retiring Linden as principal of M.S. 54 by September 1999 at the latest, since he began that school year in the position. (See id. 42; 128.) Buchsbaum was appointed as principal of M.S. 44 at some point during Defendant Mazza's superintendency; i.e., between 1993 and 1997. (Id. 40-41; Trial Tr. Dec. 14, 2006 565, 575.) Ultimately, neither Rosen, Lynch, nor Buchsbaum were eligible for a principalship at the same time as Plaintiff, and thus they were not "similarly situated" to Plaintiff at the relevant time.[6]

---

[6]    The Court notes that Plaintiff could not be required to produce evidence of a comparator as identically situated to Plaintiff as Defendants appear to demand. (See, e.g., Defs.' Mot. 7;) see also

24

Although Plaintiff does not specifically raise this point
in her Opposition to the instant Motion, she has previously
argued that "[f]rom January 2000 on, if there was no vacancy for
[Plaintiff] to assume . . . [Defendant] Romandetto was required
to bump one of the less senior white principals": e.g., Rosen,
Lynch, or Buchsbaum. (Pl. Letter Dec. 17. 2006.) However,
Plaintiff has presented no evidence indicating that any
unassigned principal ever bumped an assigned principal from his
or her school placement based on the greater seniority of the
unassigned principal. Therefore, Plaintiff cannot show that
Defendant Romandetto's failure to bump Rosen, Lynch, or
Buchsbaum in order to install Plaintiff in one of their
positions constituted an adverse employment action. See
generally Holcomb, 521 F.3d at 138 (stating requirements for
prima facie race discrimination case).[7]

---

McGuinness, 263 F.3d at 54 ("A plaintiff is not obligated to show
disparate treatment of an identically situated employee."). However,
in order to show that Romandetto assigned a white employee to a
principalship while refusing to so place Plaintiff, Plaintiff must
identify a white employee who received his or her position when
Plaintiff was also eligible for such a placement; i.e., after October
1999.

[7] The Court also notes that Plaintiff was, in fact, offered at least one
principalship—that of the Dual Language School. (Pl. Opp. 10.)
Plaintiff rejected that assignment, and has since argued that she did
so because "her assignment would be detrimental to this program." (Pl.
Opp. 10.) However, Plaintiff has presented no evidence that District
middle school principals were permitted to pick the particular school
to which they would be assigned. On the contrary, as the Chancellor's
Office indicated, her assignment to the Dual Language Middle School was
an appropriate contractual remedy. (See Pl. Trial Ex. 279(a).)

25

Because Plaintiff has failed to identify any similarly situated white principals who Defendant Romandetto treated more favorably than Plaintiff, her race discrimination claim against Defendant Romandetto must be DISMISSED.[8]

## CONCLUSION

For all the foregoing reasons, the above-captioned case is DISMISSED as to all claims.  The Clerk of the Court is directed to close the case.

SO ORDERED:

_____
**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**


Dated:     New York, New York
           February 21, 2010

---

[8]     Plaintiff states in her Opposition to Defendants' Motion that Defendant Romandetto did not "disciplin[e] any of the white principals whose schools were repeatedly failing at the same time she banished at least five African-Americans from administrative positions and replaced them with Caucasians."  (Pl. Opp. 12.)  To the extent that Plaintiff is attempting to assert a "pattern or practice" claim of discrimination, such a claim fails as a matter of law.  While neither the Supreme Court nor the Second Circuit have specifically addressed the question of whether an individual plaintiff can maintain a private, non-class action pattern or practice claim, district courts within this circuit have suggested that they cannot.  See, e.g., U.S. v. City of New York, 631 F. Supp. 2d 419, 427 (S.D.N.Y. 2009) ("Courts have held that an individual cannot maintain a private, non-class, pattern-or-practice claim."); Tucker v. Gonzales, No. 03 Civ. 3106, 2005 WL 2385844, at *5 (S.D.N.Y. Sept. 27, 2005) (collecting cases holding that pattern or practice claims are limited to class actions); see also Blake v. Bronx Lebanon Hosp., No. 02 Civ. 3827, 2003 WL 21910867, at *5 (S.D.N.Y. Aug. 11, 2003) (doubting the propriety of a pattern or practice claim in a non-class action complaint).